(No. 6352. April 6, 1937.)

T. B. CARR, Appellant, v. THE WEISER STATE BANK OF WEISER, IDAHO, a Banking Corporation, Respondent.

[66 Pac. (2d) 1116.]

George Donart and Frank D. Ryan for Appellant.

Hawley & Worthwine for Respondent.

AILSHIE, J.—Appellant first opened an account with respondent, Weiser State Bank, in the fall of 1924, maintaining both a checking account and a savings account. For twenty years prior to this time he had been doing business with banks. He had the utmost confidence in respondent and one D. H. Williams, who was the cashier and managing officer of respondent, there being no president, vice-president or director residing at Weiser. In August, 1928, appellant sold his sheep and deposited in respondent bank $36,666 and

afterward transferred part of this amount to his savings account, instructing the bank to transfer into his checking account, from time to time, whatever amount might be necessary to keep the same from being overdrawn. On several occasions Williams talked with appellant about the practice of the bank to make loans in aid of customers, and that such loans would be adequately secured by first mortgages on real property.

On being advised by Williams of a particularly good investment, one that would furnish real estate security at least three times as much as the loan, appellant agreed to have the bank make such a loan from the funds on deposit in his savings account, provided the loan was evidenced by promissory note drawing eight per cent interest, payment of the note to be adequately secured by good and sufficient real estate mortgage. November 15, 1929, appellant signed an order, or counter-slip, authorizing the withdrawal of $2,500 from his savings account, with the understanding that the sum would be used for the purpose of making the loan as aforesaid to a Mr. Wilson. Three or four times after this transaction appellant inquired of Williams about the loan. He was told by Williams that the mortgage had been sent to the courthouse for record. After the third inquiry appellant received interest on the loan, which was placed to the credit of his savings account; four or five payments of interest were made and credited on his bank account. In the fall of 1931 and January, 1932, on request of appellant, a search was made by Mr. Carroll, assistant cashier, through the bank files, for the note and mortgage, but they were not found. At the expiration of three years (the date when the note and mortgage should have matured) appellant again inquired of Williams about collection of the note. He was told that the borrower expected to get a federal loan which would take thirty to sixty days to put through. Some time after this, noticing in the papers that Williams was resigning and taking a position in a Boise bank, appellant went to the bank and had a conversation with Williams and learned for the first time that the loan did not exist and that Williams had converted the $2,500 to his own use.

It also appears that on June 22, 1933, Williams informed appellant that the bank was organizing a subsidiary loan

company, to be operated in conjunction with the bank, to handle loans that the bank could not handle, and suggested that appellant take some stock in the company. Appellant signed a counter-receipt for $500 to be withdrawn from his checking account in respondent bank and authorized respondent, through its cashier, to withdraw $500 whenever the loan corporation was organized, but did not authorize the withdrawal of this amount "or any part thereof, for any other purpose whatsoever." Other sums were withdrawn from appellant's account, included in additional causes of action, which are not here involved. Appellant made demand for payment to him of these amounts but the demand was refused by respondent.

Based on findings of the jury, assessing no damages on the first two causes of action above stated, and assessing damages of $683.17, $454.35 and $1,703.50 on the third, fourth and fifth causes of action, respectively (amounting in all to $2,841.02, and not here involved), judgment was entered in favor of plaintiff on the third, fourth and fifth causes of action and against plaintiff on the first and second, together with costs and disbursements, from which judgment plaintiff appeals.

Only two witnesses, appellant and respondent's assistant cashier, Carroll, testified in the case and there is no conflict in the evidence. The slip or order, on which the $2,500 was drawn from the savings account, read as follows (Exhibit "B"):

"Weiser State Bank

"Savings Department

"Weiser, Idaho, Nov. 15, 1929.

"Pay to a/c Loan....................or bearer, $2500.00
Twenty five hundred.......................00/100 Dollars

(amount in words)

and charge the same to my Savings Account Book No. 236
    "Balance $——

"Sign here   T. B. CARR

"This order will not be paid unless accompanied by the savings book of the depositor."

Mr. Carroll testified in relation to this order and its use and effect as follows:

"Q. . . . . Now what in banking parlance do you call that?

"A. It is an item we use to make withdrawals against savings accounts.

"Q. Is it an item used merely in the bank, or does it bear the same relationship to a savings account that a check would toward a checking account?

"A. No, sir.

"Q. In banking parlance and custom and particularly your plan of operations in the Weiser State Bank, what was the effect of the execution and leaving with the bank of that particular instrument exhibit B. Would that have enabled anyone but an officer or employee of the bank to withdraw funds from the account of T. B. Carr?

"A. No, sir, it would not.

"Q. If D. H. Williams had not been an officer of the bank, could he have withdrawn that from the bank on the strength of that instrument?

"A. No, sir, without a written order from Carr.

"Q. And would it also have to have been accompanied by Carr's passbook?

"A. Yes, sir.

. . . . . . . . . . . . . .

"Q. The only person who could withdraw from that account on that exhibit alone had to be an officer or employee of the Weiser State Bank. Is that right?

"A. Yes, sir."

He further testified:

"A. The item is dated November 15, 1929, and, according to our books it was cashed November 27th for the same amount. It was not deposited, as far as I could find, to Williams' account or Carr's account."

This money was not drawn out or actually received by Carr and it could only be drawn by an officer or agent of the bank who had access to the bank funds, by reason of his employment by the bank. Under the arrangement Carr had with the bank, acting through its cashier and managing agent, the money thus to be drawn from his savings account was to be paid to the borrower who was to execute and deliver his note and mortgage in Carr's favor, as evidence of and security

for such loan. No authority was given Williams or any other officer of the bank to disburse this money, except on condition that a note and mortgage should be given in return therefor. In violation of these instructions and the limited authority this order conferred on a bank officer, Williams abstracted $2,500 from the bank on November 27th, following the giving of the order on the 15th, and charged the same to Carr's savings account, and apparently appropriated the money to his own use. Williams took the money from Carr's savings account and charged the account therewith *as an officer of the bank* since, under the evidence, no one but a bank officer or employee could draw the money on this order.

It must logically and necessarily follow that this money when abstracted and appropriated by Williams was still bank money and had not yet come into the possession or under the control of Carr, whose account was wrongfully charged by Williams with the withdrawal. In other words, the money was embezzled by Williams from the bank and not from Carr. In the meanwhile Carr was lulled into repose and his confidence was maintained by his account being regularly credited with interest on this fictitious loan. Under such circumstances, when Carr learned that no loan had in fact been made, and that his account had been falsely charged with a withdrawal, which had been misappropriated by a bank official, he had a right to demand his deposit; and in such case the bank could not successfully plead the bar of I. C. A., sec. 5–218, and could only rely on sec. 5–223, which relates to bank deposits.

It is urged by respondent that this case should be governed by *Smith v. Wallace Nat. Bank,* 27 Ida. 441, 150 Pac. 21. The contention is not sound. In the Smith case the money was not sent to the bank and never became Mrs. Smith's bank deposit. She sent it to her nephew, Norbeck, whom she knew and in whom she had complete confidence, and he betrayed her confidence. Here we have a very dissimilar case.

The case of *Prewett v. First. Nat. Bank of Hagerman,* 45 Ida. 451, 262 Pac. 1057, is more nearly in point here and, together with cases there cited, is controlling, as to the application of the statute of limitations, in the case at bar.

It is argued very forcefully by respondent that loaning money for a depositor, out of funds which he has on deposit at the time, is *ultra vires* and not an authorized act under the banking laws. That such is not one of the enumerated powers of a national bank, may be conceded. (U. S. C. A., title 12, sec. 24; U. S. Comp. Stats., sec. 9661; *Holmes v. Uvalde Nat. Bank*, (Tex. Civ. App.) 222 S. W. 640.) However, we are here dealing with a state bank which is granted more comprehensive and plenary powers, under the state banking act (chap. 6, title 25, I. C. A.). While the making of loans for depositors is not specifically authorized, it is not expressly prohibited and is not *per se* unlawful. It is conceivable that in some cases it might be especially helpful to a bank to do so. It might well happen that a good customer of a bank required a loan but could not furnish bankable security, though he could furnish security considered ample for protecting the loan; and at the same time another customer might have a large sum on deposit which he desired to loan. In such a case it might turn out profitably to the bank, to have such a loan made through its cooperation and thereby accommodate both customers, and in that way enhance the bank's chances of handling both the money loaned, its repayment when due, and the resultant business which might arise to the bank through the transaction. But, to revert to the facts of the instant case, if we were to adopt respondent's theory, that Carr made Williams his personal agent for this transaction, we would be at once balked by the admitted fact that Carr did not draw the money and give it to Williams, but that Williams drew the money from the bank and could, and did, do so *only as, and by virtue of being, an officer of the bank*. (In this respect the case differs from the Uvalde Bank case, *supra*.) His authority was the authority of the bank, and that was, to take the money from Carr's savings account and pay it to the borrower in exchange for a note and mortgage. Whether he conceived the motion of appropriating the money to his own use, before abstracting it from the bank or afterward, is of no moment so far as Carr's interests and rights are concerned. The latter was relying on his faith in the bank. The bank could only act through authorized agents and servants whom it selected,

and depositors could only deal with the bank through these employees.

Carr gave Williams the order to draw the money from his savings account, not only because of his acquaintance with and confidence in Williams, but chiefly because of the fact that he was cashier and agent of the bank, and because of such official relation as he sustained to the bank. It was not the depositor's fault that the bank had an unfaithful servant. It selected him and vouched to the public for his fidelity and, as between the bank and a depositor, the bank carries the risk of abstraction and misappropriation of the funds of depositors.

What we have said with reference to the withdrawal of the $2,500 applies as well to the withdrawal of the $500, for which appellant gave Williams a counter-check which "could only be cashed by an officer or agent of the bank." This money was to be taken from Carr's checking account and used in exchange for $500 worth of stock in a subsidiary corporation that was, according to Williams, being formed for the purpose of handling loans and paper that the bank could not handle. Williams later withdrew this amount from the bank, charged it to Carr's account and appropriated it to his own use.

That part of the judgment appealed from is reversed and a new trial is granted. Costs awarded to appellant.

Morgan, C. J., and Holden and Givens, JJ., concur.